# IN THE SUPREME COURT, STATE OF WYOMING

# 2013 WY 118

APRIL TERM, A.D. 2013

October 1, 2013

GABRIEL R. DRENNEN,

Appellant
(Defendant),

v.                                                          S-11-0199

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Fremont County*
The Honorable Norman E. Young, Judge

*Representing Appellant:*
    Thomas B. Jubin of Jubin & Zerga, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
    Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy
    Attorney General; Theodore R. Racines, Senior Assistant Attorney General;
    Jeffrey Pope, Assistant Attorney General.  Argument by Mr. Pope.

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.
Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building,
Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made
before final publication in the permanent volume.

**KITE, Chief Justice.**

[¶1]    After Gabriel R. Drennen appealed his convictions for first-degree murder and aggravated assault and battery, we remanded for a hearing on his assertion that defense counsel was ineffective.  The district court found his trial counsels' performance was deficient because they failed to present expert testimony in support of his self-defense claims.  The court concluded, however, that Mr. Drennen was not prejudiced by the deficient performance.

[¶2]    Mr. Drennen argues on appeal that his convictions should be reversed because his trial was riddled with instances of prosecutorial misconduct, the district court improperly instructed the jury and he was prejudiced by his trial counsels' deficient performance.  We conclude the prosecutors committed misconduct and Mr. Drennen is entitled to reversal of his convictions.  Because we are reversing for a new trial, we address Mr. Drennen's claims regarding the jury instructions and find they are wanting in certain respects.[1]  We will not analyze the ineffective assistance of counsel arguments with any degree of specificity because we assume any deficiencies will be corrected on remand.

## ISSUES

[¶3]    The issues in this case are:

1.    Did the prosecutor engage in misconduct requiring the reversal of Mr. Drennen's convictions?

2.    Did the district court erroneously instruct the jury on self-defense with respect to the homicide charges?

3.    Did the district court erroneously instruct the jury on self-defense with respect to the aggravated assault and battery charge?

4.    Did the district court erroneously instruct the jury on the elements of first-degree murder, second-degree murder, and manslaughter?

5.    Did the district court err in ruling on Mr. Drennen's claim of ineffective assistance of counsel?

## FACTS

---

[1] Although the jury instructions need revision, we want to emphasize that we are not being critical of the district court.  Choosing among the pattern jury instructions for self-defense is, unquestionably, difficult and the task is further complicated by the piecemeal nature of Wyoming's self-defense jurisprudence.  We determined it was appropriate in this opinion to clarify some of the principles.

1

[¶4]   On May 2, 2010, Leroy Hoster was moving out of a mobile home owned by Mr. Drennen.  Mr. Hoster had a Bronco parked near the mobile home and he needed to repair a tire before he could move it.  His tools were in a storage unit also provided by Mr. Drennen, so Mr. Hoster's friend, Michael Adams, drove him to Mr. Drennen's home seeking access to the storage unit.  After a short conversation with Mr. Drennen, and apparently without gaining access to the storage unit, Mr. Hoster returned to Mr. Adams' car.  As Mr. Hoster was leaving, Mr. Drennen told him to move the Bronco, to which Mr. Hoster replied, "That's what I'm trying to do."

[¶5]   Mr. Adams and Mr. Hoster drove back to the mobile home and parked in front of it.  Mr. Hoster was upset about not being able to get his tools, and Mr. Adams tried to calm him down.  Mr. Drennen followed them to the mobile home in his truck, parked down the road and began walking toward Mr. Hoster and Mr. Adams.  He was carrying "No Trespassing" signs and packing tape.  Mr. Drennen also had a gun in a holster on his hip and an activated audio recorder in his pocket.

[¶6]   As Mr. Drennen walked toward the mobile home, he said to the other two men, "You push me around, I push you around."  Mr. Hoster threw his jacket to the ground and walked toward Mr. Drennen, insulting him.  Mr. Drennen responded, "No trespassing." Mr. Hoster then told Mr. Drennen to "get the f**k out of here," grabbed him, and threw him from the porch and over a three to four foot high fence into the yard.  According to Mr. Drennen, Mr. Hoster also said, "I'll kill you, you son-of-a-b**ch!"  Mr. Drennen landed on his back and tried to scoot backward when Mr. Hoster started coming over the fence.  Mr. Drennen yelled "hey, hey, hey!" but Mr. Hoster kept coming towards him and said, "Shoot me!"  Mr. Drennen fired five shots, hitting Mr. Hoster multiple times.

[¶7]   After Mr. Drennen stopped shooting, he pointed the gun toward Mr. Adams, who moved behind the Bronco.  Mr. Drennen put down his gun and called 911.  Mr. Adams also called 911, and both men attempted to render emergency aid to Mr. Hoster.  When the police and emergency responders arrived, Mr. Drennen was arrested and Mr. Hoster was taken to the hospital where he died from his wounds.

[¶8]   The State charged Mr. Drennen with first-degree murder, second-degree murder and aggravated assault and battery.[2]  At the trial, Mr. Drennen argued that he shot Mr. Hoster and pointed the gun at Mr. Adams in self-defense.  The jury found Mr. Drennen guilty of first-degree murder and aggravated assault and battery.  The district court entered judgment on the jury's verdict and sentenced Mr. Drennen to a term of life in prison for the murder conviction and eight to ten years in prison for the aggravated assault and battery.

---

[2] The State also initially charged Mr. Drennen with manslaughter, possession of a deadly weapon with unlawful intent, and reckless endangerment, but those charges were dismissed prior to the trial.  The jury was, however, instructed on manslaughter as a lesser included offense of the murder charges.

2

[¶9] Mr. Drennen appealed both convictions and, pursuant to W.R.A.P. 21, requested remand for a hearing on his claim that his trial counsel was ineffective. We granted his request, and the district court concluded his trial counsel performed deficiently because they failed to call expert witnesses to substantiate his claim of self-defense. The court concluded, however, that Mr. Drennen was not prejudiced by the deficient performance. We now consider his claims on appeal.

## DISCUSSION

### A.       *Prosecutorial Misconduct*

[¶10] Mr. Drennen asserts the prosecutors misled the jury regarding Wyoming's law of self-defense and their actions amounted to prosecutorial misconduct. Our standard of review for a claim of prosecutorial misconduct requires us to refer to the entire trial record. We determine whether the prosecutors' conduct prejudiced the defendant's case to the degree he was deprived of a fair trial. Likewise, the propriety of any comments made by the prosecutors during closing argument is measured in the context of the entire argument. *Strange v. State*, 2008 WY 132, ¶ 4, 195 P.3d 1041, 1043 (Wyo. 2008).

[¶11] Mr. Drennen did not object to any of the prosecutors' statements at the time of trial; therefore, we review for plain error. *Id*.

> To demonstrate plain error, [the appellant] "must show that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Taylor v. State*, 2001 WY 13, ¶ 16, 17 P.3d 715, [721] (Wyo. 2001). Reversal of a conviction on the basis of prosecutorial misconduct, which was not challenged in the trial court, is appropriate only when there is a "substantial risk of a miscarriage of justice." *Capshaw* [*v. State*], 10 P.3d [560], 567 [(Wyo. 2000)] (quoting *Dice v. State*, 825 P.2d 379, 384 (Wyo. 1992)).

*Id.,* quoting *Burton v. State*, 2002 WY 71, ¶ 13, 46 P.3d 309, 313-14 (Wyo. 2002).

[¶12] The prosecutors' statements are found in the trial transcripts, satisfying the first part of the plain error analysis. The prosecution began its opening statement with the following:

> Ladies and gentlemen of the jury, over the next few days, all of the evidence you will hear will revolve around the

events that you just heard on this recording as we introduce our case to you.

I submit to you that no matter what the scenario, it really doesn't matter whether you're a fan of old western movies or modern police officer movies or perhaps even sci-fi, there's one general rule that shines through no matter what the scenario is: you do not shoot the unarmed man. You don't do it.

The prosecutor went on to describe the facts he anticipated would be presented during the trial and completed his opening statement by saying:

And we believe that you'll be able to find that on May 2nd, 2010, in Fremont County, Wyoming, the defendant, Gabriel Drennen, purposely shot Leroy Hoster with his .9 millimeter Baretta four times, killing him with premeditation and malice; and that, further, he had no legal justification to do so. None. You see, the victim wasn't armed. He never was armed. And you just do not shoot the unarmed man. Thank you.

The prosecutor followed suit in his closing argument, ending with: "We respectfully request that you go to deliberations and that you return with a verdict of guilty, because you see: in the state of Wyoming, there is a law against shooting an unarmed man." The other prosecutor focused on that point one more time in rebuttal:

Counsel said why, if he wanted to kill someone, why would he do it in broad daylight and, you know, why would he do it under these circumstances? Because he didn't know the law. That's why he did it. Two reasons. He didn't know the law. He thinks he's justified. He thinks he can shoot and kill someone even though they are unarmed.

[¶13] In general, the right to defend oneself in Wyoming, together with the amount and type of force used, depends upon what is reasonably necessary under the circumstances. "It is for the jury to determine whether a defendant reasonably perceived a threat of immediate bodily injury under the circumstances and whether the defendant defended himself in a reasonable manner. Thus, the jury must evaluate the totality of the circumstances and evaluate all of the defendant's options in protecting himself from such a perceived threat of harm." *Baier v. State*, 891 P.2d 754, 758 (Wyo. 1995); *see also Evenson v. State*, 2008 WY 24, ¶ 14, 177 P.3d 819, 825 (Wyo. 2008). "Under this formulation, the presence or absence of a weapon is relevant as part of the totality of the

4

circumstances, but it is not determinative." *Evenson*, ¶ 14, 177 P.3d at 825. The prosecutors' assertions that Wyoming law prohibits shooting an unarmed man were inaccurate, and the record leaves no doubt that the prosecutors misinformed the jury in that regard.

[¶14] The third prong of the plain error standard was also satisfied in this case—the prosecutors' violation of the clear and unequivocal rule of law affected Mr. Drennen's substantial rights. *Strange*, ¶ 4, 195 P.3d at 1043. "The right with which we are concerned is the fundamental right to a fair trial, free from tainted argument." *Jones v. State*, 580 P.2d 1150, 1154 (Wyo. 1978). In many instances, the prejudice from incorrect statements of law made by prosecutors may be diluted by correct statements of the law in jury instructions, subsequent arguments by the prosecution, or by arguments made by defense counsel. *See Evenson*, ¶ 16, 177 P.3d at 825. However, "[w]here a prosecutor repeatedly misstates the law to a jury, and thereby plants an erroneous conception which prejudices the defendant, a fair trial may, under certain circumstances, have been denied." *Jones*, 580 P.2d at 1154.

[¶15] In this case, the prosecutors' repeated misstatements regarding the law of self-defense were prejudicial and were not remedied by the jury instructions or subsequent arguments by the prosecutors or defense counsel. One glaring example of the prejudice Mr. Drennen suffered occurred during defense counsel's opening statement when he tried to explain to the jury that the prosecution's assertion regarding self-defense was incorrect:

> [DEFENSE COUNSEL]: This is about self-defense, ladies and gentlemen. Nothing in the law says that, you know, you can't shoot an unarmed man. An unarmed man can do a severe amount of damage. . . .
>
> [Mr. Hoster's] already thrown Mr. Drennen over the fence. Mr. Drennen landed on his head and shoulders, almost knocked unconscious, and Mr. Hoster is still coming after him. How far do you go before you can defend yourself?
>
> There's nothing in the law that says you can't shoot an unarmed man. You know, --
>
> [PROSECUTOR]: Objection, Judge. That is improper at this point to make a statement like that and I would submit it's a misstatement of the law.
>
> THE COURT: Let's move on, counsel.

[¶16] Not only was the jury told that one cannot shoot an unarmed individual, but when defense counsel tried to correct that inaccurate claim in his opening statement, the prosecutor objected to his argument as improper and a misstatement of the law. The district court told defense counsel to "move on," likely leaving the jury with the impression that one may never, under any circumstances, shoot an unarmed individual. Although the jury was given a series of instructions at the end of the trial explaining that the law of self-defense is based on a reasonableness standard, the district court did not instruct them specifically that shooting an unarmed individual could be considered reasonable under appropriate circumstances. Without clarification on that point, there is a significant danger the jury was led to believe that deadly force is *always* unreasonable when the victim is not armed. This danger was increased when, after the jury instructions were given, the jury heard the prosecutors end their closing and rebuttal statements with assertions that, "in the state of Wyoming, there is a law against shooting an unarmed man," and "[Mr. Drennen] didn't know the law. . . . He thinks he can shoot and kill someone even though they are unarmed." Under these circumstances, Mr. Drennen has established the prosecutor's misstatements met the plain error standard.

[¶17] Mr. Drennen also asserts there were many other instances of prosecutorial misconduct. We will not consider each of Mr. Drennen's other claims of prosecutorial misconduct in detail; however, we do observe that, in some instances, the prosecutors improperly vouched for their witnesses, ignored the district court's specific instructions and misstated the evidence. A few examples should be sufficient to guide the prosecutors on retrial. First, the district court specifically instructed the parties during the trial that Mr. Drennen and Mr. Hoster should each be referred to by their names. Despite this ruling, the prosecution continued to refer to Mr. Hoster as "the victim."[3] The prosecution also stated in closing argument that Mr. Drennen provoked the conflict by "hitting at, striking out at" Mr. Hoster. We have not been directed to any evidence that Mr. Drennen physically assaulted Mr. Hoster prior to being thrown over the fence. Consequently, that statement was improper and should not have been made. *Mercer v. State,* 2012 WY 54, ¶ 11, 273 P.3d 1100, 1103 (Wyo. 2012); *Wilks v. State,* 2002 WY 100, ¶ 27, 49 P.3d 975, 987 (Wyo. 2002).

[¶18] Another example, which was not even raised on appeal, occurred during the prosecutors' rebuttal closing argument: "Mike Adams testified from the heart. He told you the truth. He told you what he saw, what he heard. He relived it, painfully, in front of you. He didn't lie to you." This is a classic example of a prosecutor impermissibly vouching for the credibility of a witness. Mr. Adams was the State's eye witness to the homicide and the alleged victim of the aggravated assault; consequently, the improper vouching pertained to both convictions. Statements like these have been deemed

---

[3] Our objective is not to agree or disagree with the correctness of the district court's instruction, but simply to point out that the parties have an obligation to follow a district court's rulings. *See generally*, *Craft v. State,* 2013 WY 41, ¶¶ 12-13, 298 P.3d 825, 829 (Wyo. 2013) (indicating attorneys must follow the court's instructions).

reversible error in the past, even under the plain error standard of review. *See Condra v. State*, 2004 WY 131, ¶ 15, 100 P.3d 386, 390 (Wyo. 2004); *Dysthe v. State*, 2003 WY 20, ¶ 31, 63 P.3d 875, 886 (Wyo. 2003).

[¶19] The prosecutors' misstatements were substantial. In addition, as we conclude, *infra,* the instructions on the law of self-defense were confused, and there was evidence to support the district court's finding of deficient performance of defense counsel. Given these numerous errors, we are convinced both Mr. Drennen's murder and aggravated assault and battery convictions were tainted and, therefore, reverse for a new trial on all counts.

## B. *Jury Instructions*

[¶20] When this Court reviews jury instructions, we abide by the rule that the "[i]nstructions must be considered as a whole, and individual instructions, or parts of them, should not be singled out and considered in isolation." *Farmer v. State*, 2005 WY 162, ¶ 20, 124 P.3d 699, 706 (Wyo. 2005) (quoting *Giles v. State*, 2004 WY 101, ¶ 14, 96 P.3d 1027, 1031 (Wyo. 2004)). "[A]s long as the instructions correctly state the law and the entire charge covers the relevant issues, reversible error will not be found." *Id*. We have also held that:

> "[A] defendant has the right to have instructions on his theory of the case or his theory of defense presented to the jury if the instructions sufficiently inform the jury of the theory of defense and if competent evidence exists which supports the law expressed in the instructions." *Thom v. State*, 792 P.2d 192, 195 (Wyo. 1990). However, we have also noted that "[n]ot every instruction must be given simply because there is a claim that it incorporates a theory of the case." *Wilkening v. State*, 922 P.2d 1381, 1383 (Wyo. 1996). A trial court may properly refuse to give a proposed instruction if it is erroneous, confusing, argumentative, or if the instruction unduly emphasizes one aspect of the case, the law, or the defendant's version of the events. *Madrid v. State*, 910 P.2d 1340, 1346 (Wyo. 1996); *Jansen v. State*, 892 P.2d 1131, 1140 (Wyo. 1995); *Virgilio v. State*, 834 P.2d 1125, 1128 (Wyo. 1992). Additionally, "instructions not based on the evidence can be properly refused." *Chavez-Becerra v. State*, 924 P.2d 63, 67 (Wyo. 1996).

*Farmer*, ¶ 23, 124 P.3d at 707.

[¶21] The plain error standard of review applies when a defendant does not object to the instructions at trial. *Bloomfield v. State*, 2010 WY 97, ¶ 9, 234 P.3d 366, 369 (Wyo. 2010). Mr. Drennen objected to some of the instructions he challenges on appeal and did not object to others. Because we are reversing and remanding for a new trial on both convictions, we will simply analyze the jury instructions without concluding whether any individual instruction constituted clear error or was prejudicial or harmless.

### 1. Self-Defense Instructions—Homicide Charge

[¶22] Before addressing the self-defense instructions in this case, we find it helpful to review the history of self-defense in Wyoming. Unlike other states, we do not have a great deal of statutory guidance on the law of self-defense. Instead, the common law concept of necessity guides most of our jurisprudence. As we noted in the prosecutorial misconduct section of this opinion, the right to defend oneself and the amount and type of force which may be used depend upon what is reasonably necessary under the circumstances. *Mendoza v. State,* 2013 WY 55, ¶ 16, 300 P.3d 487, 492 (Wyo. 2013). *See also, Baier,* 891 P.2d at 758. To justify taking the life of another, it must reasonably appear to the defendant that he was in great peril of suffering death or serious bodily injury at the hands of the deceased and there must have been no other reasonable means to avoid the killing. *See, e.g., Leeper v. State,* 589 P.2d 379, 382 (Wyo. 1979); *Durham v. State,* 29 Wyo. 85, 96, 210 P. 934, 938 (1922); *Ross v. State,* 8 Wyo. 351, 383, 57 P. 924, 931 (1899). The defendant has an initial burden of making a prima facie case that he acted in self-defense; however, once that minimal burden is satisfied, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, and the jury must be instructed accordingly. *Small v. State,* 689 P.2d 420, 423 (Wyo. 1984); *Olsen v. State,* 2003 WY 46, ¶ 144, n. 12, 67 P.3d 536, 589, n. 12 (Wyo. 2003).

[¶23] Over the years, we have provided specific guidance for applying the reasonableness standard. The effect of these decisions has been to establish certain rules of law that frame the reasonableness analysis. The duty to retreat and the right to stand one's ground are particular rules of law which have further defined the jurisprudence of self-defense in this state. In *Garcia v. State,* 667 P.2d 1148, 1153 (Wyo. 1983), this Court undertook a comprehensive review of the relevant case law and reached the following conclusion:

> In general, it can be concluded from these prior discussions that an individual who is without fault in bringing about the incident in which he kills his assailant need not restrict his freedom of movement to go where he has a right to be. The "duty to retreat," where it prevails, is applied in cases of actual assault. Under the circumstances of this case the following comment is instructive:

" * * * [A] person who provokes or brings on the difficulty in which he kills his assailant cannot invoke the right of self-defense, unless he in good faith retreats as far as he safely can, making that fact manifest to his adversary. * * * " *State v. Flory,* supra, 40 Wyo. at 199, 276 P. at 462.

Given these prior adjudications with respect to self-defense, the law in the State of Wyoming requires that prior to resorting to deadly force a defendant has a duty to pursue reasonable alternatives under the circumstances. Among those reasonable alternatives may be the duty to retreat.

[¶24] The *Garcia* decision accurately cited *State v. Bristol,* 53 Wyo. 304, 84 P.2d 757 (1938); *State v. Flory,* 40 Wyo. 184, 276 P. 458 (1929); *State v. Sorrentino,* 31 Wyo. 129, 224 P. 420 (1924); *Delaney v. State,* 14 Wyo. 1, 81 P. 792 (1905); and *Palmer v. State,* 9 Wyo. 40, 59 P. 793 (1900) in support of its conclusion. *Palmer,* for example, held that a person is not required to retreat and may stand his ground and kill his assailant if he is assaulted, without fault, in his own home.[4] *See also*, *Delaney,* 81 P. at 794; *Sorrentino,* 224 P. at 424. *Flory,* 276 P. at 462, on the other hand, held that a person who is an aggressor has a duty to retreat before using deadly force. *See also*, *Small,* 689 P.2d at 424. The *Flory* decision quoted with favor an Oklahoma decision, *Hays v. Territory,* 52 P. 952 (Okla. Terr. 1897), reversed on other grounds, 54 P. 300 (Okla. Terr. 1898):

Self-defense is one of the rights which the law of necessity gives to man. It is founded and based on necessity-on the inability of the executive machinery of the law to be always with the citizen to protect him from the aggression of others. A right of such a high character must also, of necessity, be attended with high responsibilities; and that is the obligation on the part of one who exercises the right to be the executioner of his fellow man to see that his own conduct is exemplary. Self-defense is a legal right, not an excuse for a homicide, and it can be exercised only where he who employs it is himself in the right at the time or moment of its use. The aggressor-one who strikes another, and thereby brings on a

---

[4] This rule is known as the castle doctrine because a man's home is his castle and he has the right to defend his family and himself therein. D. Drake, The Castle Doctrine: An Expanding Right To Stand Your Ground, 39 St. Mary's L.J. 573 (2008). The castle doctrine, in its strictest sense, does not appear to be at issue in this case. Even though Mr. Hoster had lived in the trailer and Mr. Drennen owned it, there was no specific argument that either of them considered the trailer as his home to make it or its curtilage relevant to the self-defense analysis.

9

combat, or one who by the use of vile and opprobrious language almost as surely brings on a combat-is not clothed with the right of self-defense, so long as he continues to persist in his own wrongdoing. He must discontinue his own assault, whether by violence or by word, before the law of necessity says that he can strike down his assailant; and whether or not he is required to retreat before resorting to the awful extremity of taking human life, when he is in the right, he certainly must resort to that simple expedient, if it is consistent with his safety, when he is in the wrong.

*Flory,* 276 P. at 462.

[¶25]  In *Bristol,* 84 P.2d at 761-67, the defendant and the deceased had a previous altercation in another establishment and the deceased threatened to "stomp" Bristol's face.  After an extensive analysis of the policies underlying the duty to retreat and the right to stand one's ground, this Court ruled that even though, after the earlier altercation, the defendant armed himself, went to a café where the deceased was present and glared at him, he was not the aggressor.  He had the right to move about freely and was not required to avoid places where the deceased was likely to be.  Contrary to the State's argument to the jury, Bristol was not obligated to go home rather than enter the restaurant.

[¶26]  Taking into consideration the history of the law of self-defense, the *Garcia* court held an instruction which informed the jury the defendant had a duty to "retreat rather than take the life of his adversary if there was a convenient mode of retreat without increasing his peril or apparent peril" was correct under the circumstances of that case.  *Garcia,* 667 P.2d at 1151-53.  The Court stated, however, that such an instruction might not be appropriate in other cases.  *Id.* at 1153.  Presumably the Court's caution was in reference to the precedent holding that, in some cases, a person may be entitled to stand his ground.  A review of the facts of *Garcia* demonstrates the reasons for that holding and the corresponding caution.  Garcia would not have been entitled to stand his ground and would have been required to retreat because he was the obvious aggressor, at least with respect to the final altercation between the adversaries.  After quarreling with the victim, Garcia went into the kitchen (which had an exterior door), retrieved a knife, returned to the living room, and apparently without further provocation, fatally stabbed the victim. *Id.* at 1150-51.  Because Garcia was the aggressor and had an obvious opportunity to retreat, we held there was no error in giving the duty to retreat instruction.

[¶27]  One year after *Garcia,* this Court considered the case of *Patterson v. State,* 682 P.2d 1049 (Wyo. 1984).  In that case, the Court stated that in order to excuse a homicide on the grounds of self-defense, a defendant had to establish four factors:

10

> (1) that the slayer was not at fault in bringing on the difficulty; (2) that he believed, at the time of the killing, that he was in such immediate danger of losing his own life, or of receiving serious bodily injury, as made it necessary to take the life of his assailant; (3) that the circumstances were such to warrant reasonable grounds for such belief in the mind of a reasonable man; (4) that there was no other reasonable method of escaping or otherwise resolving the conflict.

*Id.* at 1053.

[¶28] The *Patterson* decision could be read to say that a defendant can never justify a homicide as self-defense if he was the aggressor in an affray (factor one) and that a defendant always has a duty to escape (factor four); however, there is no indication that the Court intended to deviate from prior precedent. Although the four factors are individually correct, they will not all apply in every case. Earlier precedent established an initial aggressor may have the right of self-defense if he retreats or withdraws. As for the requirement to "escape," that is tempered by the fact that a non-aggressor has the right to go where he legally may go regardless of prior altercations with another and he must consider reasonable alternatives prior to using deadly force, one of which may be the duty to retreat or "escape."

[¶29] The State argues that a person always has a duty to retreat before taking a life. If that were true, it would make no difference who was the aggressor in a conflict that ends in death. Our recitation of Wyoming case law indicates there are many homicide cases discussing the determination of which party is the aggressor. In order to reconcile the various cases we must recognize there are really two different applications of the duty to retreat. The first involves the duty of an aggressor in a conflict. Because he provoked the difficulty, he cannot assert his right to self-defense unless he first retreats. This is a type of withdrawal from criminal enterprise. In such a case, an initial aggressor may claim the right of self-defense only if he "retreats as far as he safely can, making that fact manifest to his adversary." *Flory,* 40 Wyo. at 199, 276 P. at 462. The second application of the duty to retreat is part of the analysis of the reasonableness of using deadly force and requires consideration of reasonable alternatives prior to using deadly force, one of which may be retreat or escape.

[¶30] As suggested in *Garcia,* jury instructions which emphasize the duty to retreat or the right to stand one's ground are not necessarily wrong; however, the choice of which instructions to give can, perhaps unintentionally, become determinative in a case. As we discussed in *Bristol,* 84 P.2d at 762-67, public policy obviously supports protection of human life because, once life is taken, it can never be recouped. Nevertheless, public policy also discourages bullies and should not, therefore, impose a rule that once a person is in an altercation or disagreement with another he must refrain from going any place

11

where his adversary may be. The duty to retreat and the right to move about freely can co-exist if properly viewed under the overarching umbrella of necessity and reasonableness. A balanced approach will provide that a person has the right to go anywhere that is lawful for him to go and to arm himself if it is otherwise legal to do so. He will not be viewed as the aggressor for simply asserting those rights. If, however, he is the aggressor in a conflict, he must retreat or withdraw from the conflict before his later actions will be justified by self-defense.

[¶31]  Consequently, in cases where it is clear that the defendant was the aggressor, a jury instruction should be given on the duty to retreat or withdraw. Wyoming Criminal Pattern Jury Instructions 8.03 is an example of such an instruction:

### SELF-DEFENSE BY AGGRESSOR

> Generally, the right to use self-defense is not available to an aggressor who provokes the conflict. However, if one provokes a conflict but thereafter withdraws in good faith and informs the adversary by words or actions of the desire to end the conflict and is thereafter pursued, that person then has the same right of self-defense as any other person. The person is justified in using force to the same extent that any other person would be who was acting in self-defense.

Wyoming Pattern Jury Instruction 8.04 is similar.

[¶32]  In cases where the determination of which party was the aggressor is in dispute, the jury should be specifically instructed as to the definition of "aggressor" so it can resolve the factual issue. *See generally*, 42 Am. Jur. Trials 151, § 23 (2013) (the jury at a murder trial involving a claim of self-defense in virtually all jurisdictions will be instructed as to what constitutes adequate provocation). *See also*, *Bristol*, 84 P.2d at 763-64; *Scaggs v. State*, 417 P.2d 331, 335-36 (Ok. Ct. App. 1966) (holding that the jury should be instructed on the definition of aggressor if the matter is in dispute). There is no Wyoming pattern jury instruction specifically defining aggressor, but case law guides us. In *Bristol*, we ruled, as a matter of law, the defendant was not the aggressor even though, after a prior altercation with the deceased, he armed himself, went to a public place where he knew the deceased to be, and glared at the deceased. In contrast, the defendant in *Flory* went to the deceased's house, pointed a gun at him and accused him of raping the defendant's wife. The Court quoted the *Hays* decision as defining an aggressor as "one who strikes another, and thereby brings on a combat, or one who by the use of vile and opprobrious language almost as surely brings on a combat." Under those circumstances, the defendant was determined, as a matter of law, to be the aggressor. *Flory*, 276 P. at 463.

[¶33] In *Causey v. State,* 2009 WY 111, ¶¶ 14-16, 215 P.3d 287, 292-93 (Wyo. 2009), the defendant argued a person should not be considered to have "provoked a conflict" by mere verbal insults. The defendant provided a thoughtful analysis of the issue and cited many of the cases we have discussed herein. However, because we were applying the plain error standard of review in that case and there was no clear rule of law as to the definition of provocation, we did not specifically answer the question. We did state, however, that if the issue were properly before us, we might well agree with the defendant's analysis. *Id.,* ¶¶ 20-21, 215 P.3d at 293-94.

[¶34] Although we recognize early precedent stated that using "vile and opprobrious language" may be considered sufficient aggression or provocation, we have not been directed to any homicide case where an opponent's mere words made him the aggressor. *Flory, supra.* In fact, we stated in *Garcia,* 667 P.2d at 1153, that "[t]he 'duty to retreat,' where it prevails, is applied in cases of actual assault." The statement was made in the context of determining whether an aggressor has an absolute duty to retreat or withdraw. In *Mendoza,* ¶ 19, 300 P.3d at 492-93, we recognized that an "actual assault" occurs when one threatens to use a drawn deadly weapon. Based upon this precedent, we conclude that, at least in the context of homicide, some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor. This is consistent with the general rule across the country which states that verbal provocation without more is generally insufficient to justify a deadly assault. *See, e.g.*, 42 Am. Jur. Trials 151, § 23 (2013). *See also*, *People v. Griffin,* 224 P.3d 292, 300 (Colo. Ct. App. 2009) (verbal confrontation insufficient to make person an initial aggressor in homicide case).

[¶35] Regardless of whether or not a person is the aggressor in an altercation, he must act with respect for human life and his actions must be reasonable. Wyoming Criminal Pattern Jury Instruction 8.02 properly states the general rule:

**JUSTIFIABLE HOMICIDE IN SELF-DEFENSE**

If the defendant had reasonable grounds to believe and [actually] did believe that he was in imminent danger of death or serious bodily harm from which the defendant could be saved [save himself] only by using deadly force against an assailant, the defendant had the right to use deadly force in self-defense [in order to defend himself]. "Deadly force" means force which is likely to cause death or serious bodily harm.

The circumstances under which the defendant acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable

13

belief that the assailant was about to kill the defendant or do serious bodily harm to the defendant. The danger must have been apparent, present and imminent or must have appeared to be so under the circumstances.

If the defendant believed that he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing that he was in similar danger, the defendant would be justified in using deadly force in self-defense. The defendant would be justified even though the appearance of danger later proved to be false and there actually was neither purpose on the part of the assailant [other person] to kill the defendant or do the defendant serious bodily harm nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense. If the person so confronted acts in self-defense upon such appearance of danger from honest belief, the right of self-defense is the same whether the danger is real or merely apparent.[5]

[¶36] Keeping in mind the rule that one can use deadly force in self-defense only if he has reasonable grounds to believe it is necessary to avoid death or serious bodily harm, the law has recognized that a person has a duty to pursue reasonable alternatives prior to using deadly force. One of those reasonable alternatives may be the duty to retreat. *Garcia,* 667 P.2d at 1153; *Creecy v. State,* 2009 WY 89, ¶ 23, 210 P.3d 1089, 1095 (Wyo. 2009). In other words, it is not necessary for a person to resort to deadly force if there are other reasonable alternatives available to him, one of which may be to retreat. This does not impose an absolute duty of retreat; it only requires that a person avoid using deadly force against another if there is a reasonable alternative available to him.

[¶37] With this law in mind, we consider Mr. Drennen's situation. In Instruction No. 28, the jury was instructed the fact that the defendant armed himself did not necessarily make him the aggressor. That is true; however, there were no other instructions further defining the term "aggressor" or explaining to the jury what effect a determination that Mr. Drennen was or was not the aggressor would have on its decision. Instead, in Instruction No. 29, the district court informed the jury that the defendant was required to retreat before using deadly force:

---

[5] The words in brackets are meant to be alternatives. *May v. State*, 2003 WY 14, ¶ 27, 62 P.2d 574, 582 (Wyo. 2003). The district court, in this case, did not choose between the alternatives in some of the given instructions. That made the instructions rather confusing; consequently, we urge district courts to choose between the alternatives when using the pattern jury instructions.

Even if the defendant had reasonable ground[s] to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.

[¶38] Although the State conceded in pretrial motions that Mr. Hoster was the aggressor, it argued at trial that Mr. Drennen provoked Mr. Hoster to violence by going to the trailer, having a gun in his holster and taunting Mr. Hoster. *Bristol, supra,* teaches that Mr. Drennen's actions in going to a place he had the right to be while armed with a weapon did not necessarily make him the aggressor. In addition, words alone do not make a person the aggressor. *Garcia,* 667 P.2d at 1153.

[¶39] As we said, the State has the burden of proving the defendant did not act in self-defense. *Small,* 689 P.2d at 423. However, before the self-defense issue is presented to the jury, the defendant must make a prima facie case of each element of the affirmative defense. *Olsen* ¶ 144, n. 12, 67 P.3d at 589, n. 12. Depending upon the evidence presented, the district court will determine whether the defendant has made a prima facie case that the deceased was the aggressor. When the defendant has met the minimal burden of presenting a prima facie case that the deceased was the aggressor, the district court must instruct the jury on the legal definition of "aggressor." The jury should be instructed that if it determines the defendant was the aggressor, he had a duty to withdraw or retreat before he could claim the right to self-defense. If, on the other hand, the defendant has not made a prima facie case that the deceased was the aggressor, the jury should be instructed on the defendant's absolute duty to withdraw or retreat before self-defense will be recognized. In cases where the evidence establishes, as a matter of law, the defendant was not the aggressor, the jury should not be charged that he had an absolute duty to retreat. In all cases, the jury should be instructed that the defendant was justified in using deadly force only if necessary; consequently, he must consider reasonable alternatives, which may include retreat, before using deadly force.[6] On

---

[6] In *Baier,* 891 P.2d at 759-60, we recognized that a general charge instructing the jury to evaluate the totality of the circumstances without reference to the presence of a weapon or the identity of an aggressor can be correct. Under the circumstances of that case, it was not necessary to instruct the jury about the right to arm oneself because the identity of the aggressor was not at issue. We quoted 41 CJS *Homicide* §

remand, the self-defense instructions should be modified to reflect the facts presented at trial and our clarifications of the law herein.

## 2. *Self-Defense Instructions—Aggravated Assault Charge*

[¶40]  The district court charged the jury in Instruction No. 30, as follows:

> You are instructed with respect to the charge of aggravated assault and battery, as set forth in Count 4, that it is lawful for a person who is being assaulted to defend himself from attack if he has reasonable grounds for believing and does believe that bodily injury is about to be inflicted upon him.  In doing so he may use all force which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.

Mr. Drennen claims this instruction was given in error because the alleged victim of the aggravated assault and battery, Mr. Adams, had not yet attacked him.  He argues that, instead, he felt threatened with an attack, making the following pattern jury instruction more applicable:

> A person who has reasonable grounds to believe, and actually does believe that he is threatened with an attack that justifies the exercise of the right of self-defense, need not retreat or consider whether he can safely retreat, so long as he does not use deadly force.  He is entitled to stand his ground and use such force as is reasonably necessary under the circumstances to secure himself from the attack.  This law applies even though the assailed person might have been able to gain safety by flight or by withdrawal from the scene.

W.Cr.P.J.I. 8.10.

[¶41]  Both of these instructions are correct statements of the law under certain circumstances; however, neither was necessary here.  In contrast to the general dearth of statutory guidance on the law of self-defense in Wyoming, the statute Mr. Drennen was accused of violating provides specific direction.  Section 6-2-502(a)(iii) states:

---

378c.(4) as follows:  "[A]n instruction regarding the accused's right to arm himself is neither necessary nor proper where the court instructs as to self-defense without any limitation as to provoking the difficulty."  *Id.* at 759.

(a) A person is guilty of aggravated assault and battery if he:

. . . .

(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

This statutory language is not difficult to understand and generally does not require additional instruction as to what constitutes legally justifiable action, except as discussed below. Instruction No. 30 could have been read by the jury to require that Mr. Drennen was actually being physically assaulted before he could defend himself. The statute does not require that and is sufficiently clear. Neither the instruction that was given nor Mr. Drennen's proposed instruction was necessary or proper under the circumstances presented here.

[¶42] Mr. Drennen's second contention concerning the self-defense jury instructions applicable to the aggravated assault and battery charge is also problematic. He claims the district court should have given the jury the following pattern instruction:

To justify acting in self-defense, it is not necessary that the danger was real, or that the danger was impending and immediate, so long as the defendant had reasonable cause to believe and did believe these facts. If these two requirements are met, acting in self-defense is justified even though there is no intention on the part of the other person to do the defendant harm, nor any impending and immediate danger, nor the actual necessity for acting in self-defense.

W.Cr.P.J.I. 8.11. Although this concept was included in Instruction 27, which was given to the jury, it was specifically applicable only to the homicide charges.

[¶43] We agree the jury should have been more clearly informed that it was sufficient for a claim of self-defense that Mr. Drennen reasonably perceived danger, even if such danger was not real. Although the jury was instructed on the same concept with regard to the homicide charges, we believe it is a better practice to provide instruction on the concepts that apply to self-defense for the different crimes. We assume that will be remedied at the retrial.

### 3. Elements of Homicide Instructions

[¶44] Mr. Drennen contends the district court erroneously instructed the jury when it gave the relevant portions of the following instructions:

17

Instruction No. 19

The elements of the potential lesser include[d] offense of Murder in the Second Degree, as charged in the Information in Count 2 of this case, are:

1. On or about May 2, 2010,
2. in Fremont County, Wyoming,
3. the Defendant, GABRIEL R. DRENNEN,
4. purposely and maliciously,
5. ***but without premeditation***,
6. killed a human being (to wit: Leroy Allen Hoster).

Instruction No. 22

The elements of the potential lesser included offense of Manslaughter are:

1. On or about May 2, 2010,
2. in Fremont County, Wyoming
3. The Defendant, GABRIEL R. DRENNEN,
4. voluntarily,
5. upon a sudden heat of passion,
6. ***without malice***,
7. killed a human being (to wit: Leroy Allen Hoster).

(Emphasis added.)  Mr. Drennen argues that the phrase "but without premeditation" found in element number five of Instruction No. 19, and the phrase "without malice" found in element number six of Instruction No. 22, are not really elements of second-degree murder and voluntary manslaughter and impermissibly shifted the burden of proof to him.

[¶45]  We agree that "without premeditation" is not an element of second-degree murder and "without malice" is not an element of voluntary manslaughter.  Although those words are contained in the respective statutes, that does not make them elements of the crimes. With respect to the charge of voluntary manslaughter, this Court has previously recognized that the "descriptive phrase in the statute is simply a way of saying that the element of malice required for murder in the second degree and also murder in the first degree is not required.  Consequently it is not a true element of the offense of voluntary manslaughter." *Jahnke v. State*, 692 P.2d 911, 919 (Wyo. 1984), overruled on other grounds by *Vaughn v. State,* 962 P.2d 149, 151 (Wyo. 1998); *see also State v. Keffer*, 860 P.2d 1118, 1137-38 (Wyo. 1993) ("While the absence of malice is fundamental to

manslaughter in a general definitional sense, it is not an actual element of the crime itself.") (Citations omitted.)

[¶46] We understand that the district court was trying to make the distinction between the crimes apparent for the jury. However, to state that the lack of something is an element of the crime is not the appropriate way to do so. In fact, the district court informed the jury in Instruction No. 18 that the second-degree murder statute states: "Whoever purposely and maliciously, **but without**[] **premeditation**, kills any human being is guilty of murder in the second degree. . . ." (Emphasis added.) The district court also instructed the jury in Instruction No. 21 that the pertinent part of the manslaughter statute states: "A person is guilty of manslaughter if he unlawfully kills any human being **without malice**, express or implied. . . ." (Emphasis added.) These instructions demonstrated the descriptive differences between each of the offenses without causing confusion regarding the actual elements of each of the crimes. On remand, the district court will have the opportunity to correct the elements instructions.

### 4. *Ineffective Assistance of Counsel*

[¶47] Both parties dispute the district court's ruling that defense counsel's performance was deficient but harmless. The State argues the district court erred in finding the performance deficient,[7] and Mr. Drennen argues the district court erred in finding the deficient performance was not prejudicial. The basis for the deficient performance ruling was defense counsel's failure to call experts to support Mr. Drennen's self-defense claim; that ruling was unquestionably supported by the evidence produced at the remand hearing. Additionally, the lack of expert witness testimony on behalf of Mr. Drennen made the prosecutor's misstatements on the law of self-defense even more prejudicial. Given we are reversing on other grounds, we do not need to address the specific claims made by the parties as the deficient performance presumably will not be repeated during the next trial.

### CONCLUSION

[¶48] We reverse Mr. Drennen's convictions and remand to the district court for retrial, consistent with this opinion.

---

[7] Because we are reversing on other grounds, we will not specifically address whether the State has a right to contest that determination without filing a bill of exceptions or petition for writ of review. *See Ken v. State,* 2011 WY 167, ¶¶ 32-33, 267 P.3d 567, 575-76 (Wyo. 2011).

19